**Steverson DAVIS, Plaintiff–Appellee,**

v.

**Patrick BRADY and Shawn Murphy, Defendants–Appellants.**

No. 96–2575.

United States Court of Appeals, Sixth Circuit.

Argued March 13, 1998.

Decided May 8, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied June 29, 1998.

George R. Hamo (argued and briefed), Flint, MI, John L. Cote; Willingham & Cote; East Lansing, MI, for Plaintiff-Appellee.

Frederick L. Schmoll, III (argued and briefed), Michael J. Gildner, Gault Davison Law Offices, Flint, MI, for Defendants-Appellants.

Before: KEITH, SUHRHEINRICH, and DAUGHTREY, Circuit Judges.

## OPINION

DAUGHTREY, Circuit Judge.

Defendant police officers Patrick Brady and Shawn Murphy appeal the district court's denial of summary judgment on qualified immunity grounds. The plaintiff, Steverson Davis, alleges that the defendants violated his substantive due process rights by placing him at risk of harm when they abandoned him in an inebriated condition on an unfamiliar highway. The district court found that the record presented a claim sufficient to defeat summary judgment, including the establishment of a duty not to subject Davis to danger, and that the defendant officers acted with deliberate indifference to the threat of injury to Davis. We agree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Having consumed a substantial amount of Thunderbird wine and a half-pint of vodka, Davis attempted to enter the Carriage Town Mission in Flint, where he had been living. The mission staff refused him entry due to his inebriated condition. Davis became violent and broke some of the mission's windows. The mission staff called the police.

Officers Murphy and Brady responded to the call. At 6:48 that evening, they arrested Davis for intoxication and disorderly conduct and brought him to the Flint police station. Davis was subsequently transferred to the county jail, but that facility was full. The desk sergeant therefore instructed Officers Murphy and Brady to "release Davis at the county jail if he was not so drunk that he would be a hazard to himself." No permission to transport Davis was requested by the officers nor given by their sergeant. Disregarding these instructions, the officers handcuffed Davis and placed him back in the squad car.

The officers then drove Davis to Bray Road in Genesee Township, which was located outside the city limits of Flint, and let Davis out of the squad car at the entrance to Bluebell Beach. Bray Road is a 55–mile–per–hour speed limit area, with few street lights and no sidewalk. The officers insist that they released Davis at this location at Davis's request, but Davis denies making such a request, and contends that the officers brought him to Genesee Township to "teach [him] a lesson." In his account of the situation, the officers threw him out of the car, forced him to the ground, called him a "smart ass," and told him to find his own way back into the city.

After the officers left, Davis headed for some nearby houses, where he asked one of the residents to call the police. Genesee Township Police Officer Bruce Carlson responded to the call at 9:03 p.m. According to Officer Carlson, he offered to give Davis a ride or to call someone for him, suggesting an ambulance, a taxi, and a friend or relative. Officer Carlson insists that Davis rejected assistance, calling him "just another damn white officer." In contrast, Davis maintains that he asked Officer Carlson for a ride back to Flint and that Carlson refused. Officer Carlson testified that he did not have sufficient contact during this time to ascertain whether Davis was drunk.

Officer Carlson left at 9:12 p.m., and Davis was hit by a car approximately seven minutes later, sustaining serious permanent injuries. One of his legs was amputated, and he is now a semi-quadriplegic.

Officers Brady and Murphy contend that Davis was sober when they released him on Bray Road. However, the parties have stipulated that Davis's blood alcohol level was still .176 at 10:00 p.m., when he arrived at the hospital after the accident. A toxicologist testified that at the time Davis was released on Bray Road, his blood alcohol would have been between .191 and .206, and that at that level, he would have shown signs of perception impairment, disorientation, confusion, and lack of coordination. In addition, other witnesses who saw Davis on Bray Road testified at trial that he was staggering, slurring his words, seemed drunk, and could hardly stand up.

Davis filed a lawsuit against Officers Brady and Murphy for alleged violations of his civil rights under 42 U.S.C. § 1983. The officers moved for summary judgment, which was granted in part and denied in part. The

officers now appeal the district court's denial of summary judgment.

### STANDARD OF REVIEW

 A denial of summary judgment on qualified immunity grounds is reviewed de novo. *Washington v. Newsom,* 977 F.2d 991, 993 (6th Cir.1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1848, 123 L.Ed.2d 472 (1993). When analyzing a qualified immunity issue, we must first determine whether the plaintiff has shown a violation of a constitutionally protected right. *Megenity v. Stenger,* 27 F.3d 1120, 1124 (6th Cir.1994). If so, the second step is to determine whether the right is so "clearly established" that a "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

### DISCUSSION

 Davis alleges that the officers violated his right to "substantive due process" under the Fourteenth Amendment when they deposited him on a dark, busy highway. Because Davis seeks to hold the officers liable in their individual capacities under 42 U.S.C. § 1983, he must show not only that the officers' actions were unconstitutional, but also that they should have known at that time that they were violating his rights. "[G]overnment officials' performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "It is not necessary that the very action have been previously held unlawful but, given the preexisting law, the unlawfulness of the conduct must have been apparent." *Barton v. Norrod,* 106 F.3d 1289, 1293 (6th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 341, 139 L.Ed.2d 265 (1997) (citation omitted).

 We must therefore determine whether the individual officers violated law that was clearly established in 1994 when they abandoned Davis on the dark, busy highway. When, as here, a plaintiff alleges that state actors violated substantive due process by placing him at risk of harm from a third party, the court is presented with two distinct, though interrelated inquiries:

> First, in order to find for the plaintiff, the court must conclude that the plaintiff and the state actors had a sufficiently direct relationship such that the defendants owed [him or] her a duty not to subject [him or] her to danger. Second, the court must also conclude that the officers were sufficiently culpable to be liable under a substantive due process theory.

*Stemler v. City of Florence,* 126 F.3d 856, 866 (6th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 1796, 140 L.Ed.2d 936 (1998).

### A. Taking Davis Into Custody Established a Duty

 With respect to the first question, we start from the proposition that although the state does not owe its citizens a constitutional duty to keep them from harm in all circumstances, such a duty will arise when the state has acted to deprive an individual of certain indicia of liberty:

> When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 200, 109 S.Ct. 998, 1005–06, 103 L.Ed.2d 249 (1989) (citation omitted).

 In the present case, Davis's complaint alleges—and the record can reasonably be read to show—that after taking Davis into custody, the defendant officers dropped Davis off on a dark, busy highway and left him there against his will. In so doing, the

defendant officers took the affirmative act of restraining Davis's freedom to act on his own behalf, and consequently imposed upon themselves a duty to ensure that they were not placing him in danger.

The defendants rely on *Foy v. City of Berea,* 58 F.3d 227 (6th Cir.1995), to argue that they did not infringe upon Davis's liberty. In *Foy,* the plaintiff had been drinking in a dormitory with his friends. After receiving a complaint, the police came to the dormitory and told them, "Get in your car and get out of here or somebody is getting arrested." *Id.* at 228. Although the police had told them only to leave the premises, the plaintiff and his friends decided to take a lengthy drive from Berea, Kentucky, to Crestline, Ohio. Forty-five minutes into that journey, the driver crashed the car, killing Foy. *Id.* This court held that the defendant police officers had not violated Foy's right to substantive due process, since there was no restraint on his liberty that had caused him to take the trip that resulted in his death. *Id.* at 230. *Foy,* however, is inapposite. The distinguishing factor between *Foy* and this case is that the officers never took the men in *Foy* into custody and, therefore, never assumed a duty to provide for their safety.

The defendant officers argue that they owed no duty of care to Davis because his injuries occurred after they released him from custody and they did nothing to prevent Davis from caring for himself. The defendant officers cite *DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006, for this proposition. In *DeShaney,* the mother of a child who had been beaten by his father brought a civil rights action against social workers and local officials who had received complaints that the child was being abused by his father but had not removed him from his father's custody. The Supreme Court held that the state had no constitutional duty to protect the child because "the harms [the child] suffered did not occur while he was in the State's custody, but while he was in the custody of his natural father ..." *Id.* The Supreme Court held that "in the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionaliza-

tion, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* at 200, 109 S.Ct. at 1006. Even though the state had previously taken the child into custody, the Supreme Court held that "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Id.* at 201, 109 S.Ct. at 1006.

*DeShaney,* however, is not dispositive here. Language in that opinion suggests that the state may owe a duty to individuals in certain non-custodial settings:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

489 U.S. at 201, 109 S.Ct. at 1006. Significantly, we have previously suggested that this language in *DeShaney* stands for the proposition that "a duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger." *Gazette v. City of Pontiac,* 41 F.3d 1061, 1065 (6th Cir.1994). Unlike the situation in *DeShaney,* moreover, the defendant officers in this case placed Davis in a more dangerous situation than he was prior to their interference, when they drove him outside the Flint city limits and abandoned him on a dark and dangerous highway in an unfamiliar area.

Likewise, the defendant officers' contention that the release of Davis from their custody terminated their duty is unavailing. The holding in *Stemler,* 126 F.3d at 867–868, established that an officer's duty exists even after the custodial relationship has ended. In *Stemler,* this court determined that police officers violated a woman's substantive due

process rights when they took her from a car in which she had been riding and placed her in a truck driven by her abusive, intoxicated boyfriend, who wrecked shortly thereafter. The court found that the woman was deprived of her liberty (and ultimately her life) without due process when the police threatened to arrest her if she did not leave with her boyfriend and, subsequently, physically placed her in his truck. Even though the woman was out of police custody when she was killed, we held that the police had a duty to protect her by focusing on the fact that she was in the officers' custody at the time she was forced into the truck. *Id.* at 869.

Just as the police in *Stemler* had a duty to the plaintiff because they put her in harm's way, the defendant officers here owed Davis a duty. Based on *Stemler*, the fact that Davis's injuries resulted after the defendant officers released him from custody is not controlling. What is key is that the defendant officers put Davis in a situation, while in custody, and allegedly against his will, that caused his injuries.

■ Finally, the defendant officers assert that in 1994 there was no clearly established right not to be abandoned by the police and rely on *Walton v. City of Southfield*, 995 F.2d 1331, 1337 (6th Cir.1993), to support this assertion. *Walton*, however, is inapposite. The plaintiffs in *Walton* were child passengers in a car driven by a woman who was arrested. The children were left to find a way home on their own. The court held that the officers were entitled to qualified immunity because *DeShaney* did not recognize a passenger's clearly established right not to be abandoned by the police after the arrest of the driver of the vehicle in which they were riding. *Id.* at 1337. The court also stated, however, that *DeShaney* did not foreclose the possibility that such a right existed if "abandonment in a forlorn place" was connected with the state's restraint of an individual's personal liberty. *Id.*

Unlike the children in *Walton*, Davis was in custody when he was abandoned. Because the defendant officers had custody of Davis, they owed him a duty of protection that was violated when they abandoned him, in the words of *Walton*, in a "forlorn place."

## B. Defendants Violated Their Duty to Davis by Exhibiting Deliberate Indifference

The determination that the officers owed Davis a duty of care does not end the court's inquiry, for it must also assess what duty of care they owed, and whether they breached that duty.

In cases such as this one, where the plaintiff suffered injury as a result of being placed in the state's custody, it has consistently and uncontroversially been the rule that a constitutional claim arises when the injury occurred as a result of the state's deliberate indifference to the risk of such an injury. *See Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Although each of these cases involved an Eighth Amendment claim raised by a prisoner, we have repeatedly held that at least the same standard applies to substantive due process claims raised by other persons in the custody of the state. *See, e.g., Durham v. Nu'Man*, 97 F.3d 862, 869 (6th Cir.1996) (patient at state mental hospital), *cert. denied*, —— U.S. ——, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997); *Lintz v. Skipski*, 25 F.3d 304, 306 (6th Cir. 1994) (children in state foster home); *Heflin v. Stewart County*, 958 F.2d 709, 713–14 (6th Cir.1992) (pretrial detainee); *Meador v. Cabinet of Human Resources*, 902 F.2d 474, 476 (6th Cir.1990) (children in state foster home).

■ In the present case, Davis's complaint, as well as the evidence in the record, when read in the light most favorable to Davis, supports a claim that the defendant officers acted with deliberate indifference to the threat of injury to him. They knew, or reasonably should have known, that Davis was drunk and unable to care for himself. Independent witnesses testified under oath that Davis was staggering after the defendant officers released him, slurring his words, seemed drunk, and could hardly stand up. It was stipulated at trial that Davis's

blood alcohol level was .176 percent at 10:00 p.m. when he arrived at the hospital after the accident. Additionally, a toxicologist placed his blood alcohol level at the time of the improper police release at approximately .20 percent. At such a level, expert testimony indicated, Davis would have had perception impairment, disorientation, confusion, and lack of coordination. Nevertheless, the defendant officers chose to act affirmatively to place Davis in harm's way.

### CONCLUSION

When a plaintiff alleges that state actors violated substantive due process by placing him at risk of harm from a third party, he must demonstrate, first, that the defendants owed him a duty not to subject him to danger and, second, that the defendants violated this duty by exhibiting deliberate indifference to the plaintiff's well-being. In this case, the taking of Davis into custody triggered the defendant officers' duty to protect Davis. There is sufficient evidence in the record to demonstrate that the defendant officers violated this duty when they exhibited deliberate indifference to Davis's well-being by abandoning him, in his inebriated state, on an unfamiliar, dark, and busy highway. Accordingly, we **AFFIRM** the district court's denial of the defendant officers' motion for summary judgment and **REMAND** the case for further proceedings.