NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0775n.06

No. 12-6278

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Aug 21, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ROBERT L. SALYERS, SR., as Administrator of the Estate of Robert L. Salyers, Jr., | ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| CITY OF PORTSMOUTH; CHARLES H. HORNER; DAVID THOROUGHMAN; J. B. LEACH; JAMES DAVIS, II; BRUCE BARNEY; ROBERT NICHOLS; TIFFANY UNDERWOOD, Individually and in Their Official Capacities, | ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) ) ) | |

Before:  COLE and COOK, Circuit Judges; KATZ, District Judge.[*]

COOK, Circuit Judge.  Plaintiff-appellant Robert Salyers, Sr., representing the estate of his

son Robert Salyers, Jr. ("Salyers"), sued the City of Portsmouth, Ohio, and two of its officers,

Sergeant James Robert Davis, II, and Lieutenant J. B. Leach (collectively "Portsmouth defendants"),

under 42 U.S.C. § 1983 and Ohio tort law.  After discovery, Defendants moved for summary

judgment on the basis of qualified immunity, which the district court granted.  Challenging this

decision, Plaintiff argues that Davis violated his son's Fourteenth Amendment rights by dropping

---

[*] The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

him off behind a guardrail on the side of the highway, where a third-party motorist accidentally struck and killed him. The claims against Sergeant Davis determine Lieutenant Leach and the City's liability. Plaintiff also appeals the district court's denial of his motion to amend the complaint in order to assert a claim under Kentucky law. For the following reasons, we AFFIRM.

I.

One morning in June 2008, Plaintiff delivered his son's daily Methadone tablets, prescribed for chronic pain due to a work-related injury, and watched him take the morning dosage. Salyers also had a history of substance abuse, self-medicating with Xanax and Oxycodone he purchased on the street. At the time of his death, Salyers had accumulated two DUI's, various license suspensions, and a possession-of-drug-paraphernalia arrest.

Some time after his father's departure, Salyers left his Franklin Furnace, Ohio residence and began driving west on U.S. 52 through New Boston, Ohio. Still on U.S. 52, he rear-ended a Time Warner Cable truck and fled the scene, continuing west toward Portsmouth. Two hours later, Salyers crashed into a second vehicle at the intersection of U.S. 23 and 8th Street in Portsmouth. Portsmouth Police Officer Robert Nichols arrived at the scene, found Salyers, and matched his car to the description of the vehicle responsible for the Time Warner hit-skip. Trying to gauge Salyers's mental state, Nichols placed him in the back of a police cruiser. Though noting that "something . . . didn't seem right about [Salyers]," both Nichols and Portsmouth Police Captain David Thoroughman smelled no alcohol on him. (R. 75, Nichols Dep. at 83-84.) Nichols also testified that Salyers

appeared lucid and remained cooperative throughout the encounter.  After issuing him a citation for reckless driving, Nichols released Salyers into the custody of New Boston Police Captain Steve Goins.  Captain Goins issued Salyers a second citation and let him go shortly after.  Because a towing company had already removed Salyers's car from the scene, he began wandering the streets of downtown Portsmouth on foot.

Around 5 p.m., someone called Portsmouth dispatch complaining about a man, fitting Salyers's general description, pounding on car windows and attempting to enter a car stopped at a red light.  By the time police arrived at the scene, the subject was nowhere to be found.

That night, at about 8:45 p.m., dispatch received another complaint involving an individual matching Salyers's description.  This time, the subject was throwing bricks at a parked vehicle outside the Portsmouth Army Recruiting Center.  Davis and Officer Tiffany Underwood arrived at the scene minutes after the call, but still too late.  Soon thereafter, Davis spotted Salyers walking across the Grant Bridge, the interstate thoroughfare carrying traffic on U.S. 23 between Ohio and Kentucky. The bridge lacks a pedestrian walkway. Concerned that the bridge was a dangerous place for a pedestrian, Davis pulled up behind Salyers and turned on his emergency lights to alert oncoming drivers.  The officer approached Salyers, frisked and cuffed him, and placed him in the backseat of the cruiser.  By this point, Officer Underwood arrived at the scene, pulling up behind Davis's cruiser.  She approached both men as they were standing outside the cruiser and watched as Davis performed the pat down and placed Salyers inside the cruiser.  She then left the bridge in

order to locate the owner of the vehicle damaged by the brick-throwing, but was unsuccessful. Sitting cuffed in Davis's cruiser for approximately twenty minutes, Salyers answered various questions geared toward assessing his mental state. Davis testified that Salyers knew the date, the current president, and where the United States was at war. Thus, Davis concluded that Salyers was unimpaired.

Davis could not arrest Salyers for a misdemeanor without a warrant or personally observing the criminal conduct, nor could he bring charges against Salyers without a complaining witness. Davis related this information to Lieutenant Leach, who had arrived at the scene and pulled up next to Davis's cruiser. At that point, Leach instructed Davis to let Salyers go but cautioned: "[j]ust don't leave [Salyers] on the bridge." (R. 72, Leach Dep. at 40, 43.)

Davis offered to drop Salyers off at a restaurant or similar establishment where he could call for a ride home, but Salyers replied there was no need because he had already done so. Davis then suggested calling Salyers's father to make sure he was on his way, but Salyers declined, claiming his father was already on the way. Because of the vehicle traffic, Salyers could not stay on the bridge, so Davis drove him across the rest of the bridge, leaving him in a large grassy area protected by a guardrail near U.S. 23's Kentucky approach. The shoulder of the road in this area, Davis noted, was large enough to pull over semi-tractor trailer trucks. Davis noted that "to the best of [his] knowledge" he uncuffed Salyers after dropping him off over the bridge. (R. 71, Davis Dep. at 193.) He warned Salyers not to walk on the highway again. Some time after leaving Salyers on the side

of U.S. 23, Davis called Portsmouth dispatch and suggested they inform South Shore police about the incident on the bridge.

Approximately fifteen minutes after the drop-off, Salyers crossed the barrier protecting the grassy area and walked onto the eastbound traffic lane, where Brenda Gammon fatally injured him with her car. Plaintiff filed a § 1983 action on his son's behalf against Portsmouth and certain of its officers, adding an Ohio-law negligence claim against Gammon. Gammon and the Portsmouth defendants filed separate motions for summary judgment. The district court granted Gammon's motion for summary judgment, finding no breach of duty. Plaintiff does not challenge that judgment. The court also granted summary judgment to the Portsmouth defendants on qualified immunity grounds. Plaintiff timely appeals.

II.

A. Standard of Review

We review de novo a district court's grant of summary judgment, affirming if the record, viewed in the light most favorable to the nonmoving party, leaves no genuine issue of material fact such that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 324 (6th Cir. 2011). Whether qualified immunity shields an officer from liability is a question of law, which we also review de novo. *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

B. Qualified Immunity

As government officials acting within the scope of duty, Davis and Leach may assert qualified immunity. *Bukowski v. City of Akron*, 326 F.3d 702, 708 (6th Cir. 2003). Our qualified immunity standard asks: (1) did the facts alleged show the officer's conduct violated a constitutional right, and (2) was the right clearly established at the time of the alleged violation? *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Further, "if no constitutional right would have been violated by the officer's conduct . . . there is no necessity for further inquiries concerning qualified immunity." *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004) (quoting *Saucier*, 533 U.S. at 201). The plaintiff bears the ultimate burden of establishing that the defendants are not entitled to qualified immunity. *Rodriguez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011). Because Davis was the only defendant who had more than passing contact with Salyers, we review his qualified immunity claim first.

C. No Constitutional Violation

Plaintiff contends that Davis's actions violated Salyers's Fourteenth Amendment due process rights.[1] He asserts that by leaving Salyers on the grass near the highway, Davis was deliberately indifferent to the obvious risk of harm posed by the approaching traffic. Normally, "a State's failure

---

[1] Although Plaintiff does not specify whether substantive or procedural due process should drive our analysis, his argument points to the former, which "protects individuals against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Stemler v. City of Florence*, 126 F.3d 856, 866 n.10 (6th Cir. 1997) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). This general proposition comes with two exceptions: first, where the State restricts the "individual's freedom to act on his own behalf" (the "custody" exception); and second, where its actions make the individual more vulnerable to private violence (the "state-created danger" exception). *Id.* at 200-01; *Stemler v. City of Florence*, 126 F.3d 856, 867-68 (6th Cir. 1997) (applying "custody" exception); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (applying "state-created danger" exception). Because Plaintiff specifically disavowed the state-created danger exception, we focus only on the custodial carve-out's applicability.

### 1. No Custodial Duty

Plaintiff cites this court's reasoning in *Stemler v. City of Florence* to support his argument. In *Stemler*, the decedent, Connie Black, asked her friend, Susan Stemler, to drive her home after an altercation with her drunk boyfriend at a local bar. 126 F.3d at 860. Black's boyfriend recklessly pursued Stemler's vehicle until the police detained both cars. Ignoring the boyfriend's obviously intoxicated state, the officers threatened to arrest Black unless she got into his car. *Id.* at 862. The officers carried Black to her boyfriend's truck, depositing her in the passenger's seat against her will. *Id.* at 862 n.6 (stating that Black "involuntarily left the scene of the police stop" with the boyfriend). Shortly after leaving the scene, Black's boyfriend lost control of the truck and collided with a guardrail, instantly killing Black. *Id.* at 863. This court ruled that the officers, having deprived Black

of the freedom to act on her own behalf, placed her in custody and therefore owed her a duty to prevent harm. *Id.* at 868 (describing the officer's actions as "a restraint on Black's personal liberty, not a failure to act on her behalf").

Unlike *Stemler*, nothing in this case suggests that Salyers resisted Davis's proposed drop-off point. Davis's uncontroverted testimony was that Salyers asked to be dropped off on the side of the road, claiming that "his dad was on his way . . . [and] would meet [Salyers] on the [Kentucky] portion of the [Grant] bridge." Salyers also rejected Davis's offer to take him somewhere to call and confirm his father was on the way. Moreover, Plaintiff offers no evidence to support that Davis restrained Salyers's freedom in the moments preceding the accident, which occurred after Davis left the scene.

Plaintiff mistakenly likens this case to *Davis v. Brady*, 143 F.3d 1021 (6th Cir. 1998). After consuming a "substantial amount of Thunderbird wine and a half-pint of vodka," Davis, a homeless man, broke some of the local mission's windows after they denied him lodging. 143 F.3d at 1023. Mission staff called the police, who arrested Davis and took him to the county jail. Finding the jail at full capacity, the desk sergeant instructed the arresting officers to release Davis, "if he was not so drunk that he would be a hazard to himself." *Id.* Disregarding those orders, the officers took Davis to a road outside the city limits and left him there against his will. Davis alleged that the officers threw him out of the car, forced him to the ground, and verbally insulted him. *Id.* Abandoned on the side of the road, Davis walked to a nearby house and called a third officer for a ride back to town,

to no avail. Within minutes of the third officer's departure, a car struck Davis, paralyzing him from the waist down. This court applied *DeShaney*'s custodial exception, underscoring the fact that the officers "dropped Davis off on a dark, busy highway and left him there against his will." *Id.* at 1024. Having taken the "affirmative act of restraining Davis's freedom to act on his own behalf, [the officers] . . . imposed upon themselves a duty to ensure they were not placing him in danger." *Id.* at 1025.

In *Davis*, as in *Stemler*, the court's custody assessment relied heavily on the willfulness of the claimant. In this case, Salyers was free to choose where to go, and exercised that freedom by refusing Davis's alternative suggestions. Plaintiff offers no evidence to the contrary. Instead, he argues that Davis's call to dispatch, suggesting that they inform South Shore, Kentucky, police about the incident with Salyers, shows he lied about dropping Salyers off by the road with consent. Plaintiff's strained reading of this message does little to advance his argument. Davis's words, "You know, it might be an idea to let South Shore know he's headed their way, [and that] we had dealings with him over here," do not conflict with his account of that night. Nor do they support Plaintiff's claim that Davis "knew [Salyers] would have no choice but to walk down the highway towards South Shore" after Davis dropped him off in Kentucky. At best, the statements suggest Davis either a) was concerned that Salyers may disregard his instructions to stay behind the guard rail, or b) wanted to alert South Shore in case Salyers lied about getting picked up to end the police encounter. Neither interpretation undercuts Davis's testimony that he dropped off Salyers just beyond the bridge and that he encountered Salyers as a result of vandalism complaints. The uncontroverted record

shows that Davis did not drop Salyers off against his will, distinguishing this case from both *Stemler* and *Davis*.

This case more closely resembles *Cartwright v. City of Marine City*, 336 F.3d 487 (6th Cir. 2003). In that case, officers found Cartwright walking on the shoulder of a road on a dark, foggy night. He accepted their ride, getting as far as a nearby gas station before the officers took another individual into custody. The officers informed Cartwright that, in order to have him in the backseat with the prisoner, they needed to frisk him for weapons. Cartwright, who reeked of alcohol and appeared disoriented, refused the pat-down and left the gas station on foot. *Id.* at 489. About two hours later, a truck struck and killed him. The court concluded that *DeShaney*'s custodial exception did not apply because the officers never restrained Cartwright's liberty or rendered him unable to care for himself. *Id*. at 492.

Our reasoning in *Stemler*, *Davis*, and *Cartwright* demonstrates that Salyers was not in custody at the time of his death, such that Davis owed him no duty to protect against private violence.

### 2. No Duty Violation

Even if Salyers could establish a custodial duty, he fails to show that the officers breached it. To support a breach, Plaintiff must show that "the injury occurred as a result of the state's deliberate indifference to the risk of such an injury." *Stemler*, 126 F.3d at 870 (citing *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994)). "This is a very high standard of culpability, *exceeding* gross negligence." *Meier v. Cnty. of Presque Isle*, 376 F. App'x 524, 528 (6th Cir. 2010) (quoting *Ross v. Duggan*, 402 F.3d 575, 590 n.7 (6th Cir. 2004). Davis's actions in this case fall well short of painting a "chilling and unacceptable vision of the role of the police in our society." *Stemler*, 126 F.3d at 870.

The factors driving the *Stemler* court's conclusions do not apply here. Unlike Black, who was so inebriated that she could barely walk or talk, none of the officers who came into contact with Salyers thought he was drunk. Davis described Salyers as lucid, cooperative, and even "pleasurable to talk to." (R. 71, Davis Dep. at 171.) Moreover, the officers in *Stemler* should have known Black's boyfriend was dangerous, not just because of confrontation at the bar, but due to his reckless driving and inebriation during the police stop. They ignored an obvious risk of harm and took affirmative steps that endangered Black's life—e.g., carrying her to her intoxicated and violent boyfriend's car. Far from affirmatively placing Salyers in harm's way, *see Davis*, 143 F.3d at 1027, Davis moved Salyers behind a guard rail on a grassy spot near U.S. 23. The area was comparatively safer than Salyers's original location—walking in the middle of the road on the Grant Bridge, an area without any guard rails or a pedestrian walkway. *See Cartwright*, 336 F.3d at 493 (concluding that "[n]o reasonable jury could find that [a convenience store parking lot] was more dangerous than the shoulder of 26 Mile Road").

On this record, we cannot conclude that Davis violated Salyers's clearly established constitutional rights and, as a result, find that the district court correctly decided the qualified immunity issue.

D.  Supervisor/Municipal Liability

To prove a claim for supervisor liability against Leach, Plaintiff must show that Leach "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006).  In order to hold the City liable, Plaintiff must show that its failure to train officers regarding drug-intoxication "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  For both, "a prerequisite to [liability] is that a constitutional violation has occurred." *Watson v. City of Marysville*, No. 12-3478, 2013 WL 1224089, at *3 (6th Cir. Mar. 26, 2013) (citing *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012)); *McQueen*, 433 F.3d at 470 ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct . . . .").  Because Davis committed no constitutional violation and the remaining defendants barely interacted with Salyers, if at all, Plaintiff's claims against them also come up short.

No. 12-6278
*Salyers v. City of Portsmouth, et al.*

E.  District Court's Denial of Leave to Amend Complaint

This court reviews for an abuse of discretion the district court's denial of leave to amend a complaint, reversing only if left with "a definite and firm conviction that the trial court committed a clear error of judgment." *Leary v. Daeschner*, 349 F.3d 888, 904 (6th Cir. 2003) (citing *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)).

Plaintiff maintains that he should have been allowed to amend the complaint a second time. Notably, Plaintiff knew of the facts and law undergirding this proposed amendment long before the district court's deadline for amending pleadings.  Still, he filed the oral motion to amend at the final pretrial conference, nearly a year after the court's scheduled deadline, and well after summary judgment briefing.  Notwithstanding Federal Rule of Civil Procedure 15(a), "[o]nce the scheduling order's deadline passes, a plaintiff first must show good cause under Rule 16(b)" for the delay.  Fed. R. Civ. P. 16(b) (providing that scheduling orders "may be modified only for good cause"); *Leary*, 349 F.3d at 909 (explaining the intersection between Rule 15's liberal pleading requirements and Rule 16's good-cause requirement).  Plaintiff offers none, focusing on the purported lack of prejudice to the defense.  This argument, too, misses the mark, because a party prejudices his opponent by missing the trial court's scheduled deadlines and waiting until after summary judgment motions are filed before introducing entirely new legal theories.  *Priddy v. Edelman*, 883 F.2d 438, 446-47 (6th Cir. 1989).

Thus, because Plaintiff lacked "good cause" for the delay, the court properly exercised its discretion in denying his motion to amend the complaint.

III.

We AFFIRM the district court's grant of summary judgment to the Portsmouth defendants and denial of leave to amend the complaint.