NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0272n.06

Case No. 18-6182

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
May 24, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LISA K. WILLIAMS, Administratrix of the Estate of Keith G. Burns, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| v. | ) ) | THE EASTERN DISTRICT OF KENTUCKY |
| CITY OF GEORGETOWN, KENTUCKY; MICHAEL D. BOSSE, Individually; JON NOEL, Individually; TOMMY ENRICCO, Individually; SCOTT COUNTY, KENTUCKY; TONY HAMPTON, Individually; JEREMY NETTLES, Individually; JOHN DOE; JANE DOE, | ) ) ) ) ) ) ) ) | |
| Defendants-Appellees | ) ) | |

Before: MERRITT, KETHLEDGE, and NALBANDIAN, Circuit Judges.

PER CURIAM. This case presents tragic facts without a legal remedy. In October 2017, decedent Keith Burns was stopped by police in Georgetown, Kentucky on suspicion of driving recklessly. Burns appeared confused and gave inconsistent responses to officers' questions. The officers summoned emergency medical personnel but Burns refused treatment. The police allegedly dropped Burns at a McDonald's in Georgetown to wait for a ride. Burns was later killed in a roadway two miles away from the McDonald's. His estate claims that the officers shirked

their constitutional duty to look after someone they held in custody. The District Court dismissed, and we **AFFIRM**.

## I. FACTUAL & PROCEDURAL BACKGROUND

We accept all well-pled facts in the complaint as true. *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012). On October 2, 2017 at approximately 7:45pm, the Georgetown, Kentucky Police Department and the Scott County Sherriff's Office received a report of a reckless driver in a dark colored pickup truck. The report indicated that the truck was driving without its lights on, weaving across the center line, driving on the wrong side of the road, slamming on the brakes, and had almost hit several other cars. Defendant Georgetown police officer Tommy Enricco responded first and pulled the truck over. Defendants Georgetown police officer Jon Noel and Scott County Sheriff's Deputy Jeremy Nettles subsequently joined Enricco at the scene. The driver was 48-year-old Keith Burns. The truck belonged to Burn's deceased brother. Burns had recently been hospitalized for a stroke and was obviously frail and unsteady on his feet.

Burns "would not make eye contact" and was unable to locate his driver's license or proof of insurance. Burns stated that he lived in London, Kentucky, but he could not explain what he was doing in Georgetown, Kentucky—some ninety miles north of London. Enricco inquired about a scab on Burns's head, and Burns responded that it was from an earlier fall and he told Enricco that he had recently been hospitalized for a "neurological disorder." Burns gave "inconsistent responses" to Enricco's questions. Burns also told Enricco that he took medication for his blood pressure and a blood thinner but denied taking any medications that could affect his driving. Defendants Noel and Nettles also spoke with Burns at the scene. Burns told Noel that he was taking medication for diabetes, but that he had missed two doses of his medication that day. Based on this encounter, Enricco, Noel, and Nettles were "sufficiently concerned" about Burns's medical

condition to call the Georgetown Scott County Emergency Medical Service to examine Burns. Burns refused any treatment or transport to a medical facility, and defendants Noel, Enricco, and Nettles decided that Burns was not a danger to himself or to others. The truck was impounded.

Burns gave Officer Noel the phone number of his sister, plaintiff-administratrix Lisa Williams, who lives in London, Kentucky. Plaintiff's husband, Les Williams, received a call around 8:23pm from a Georgetown Police Department dispatcher who said Williams would receive a call from a Georgetown police officer in a few minutes about Burns. A couple of minutes later, Mr. Williams received a call from Noel, who advised Mr. Williams that Burns had been driving erratically and the police had pulled him over, determined his truck was improperly tagged, the truck had been impounded, and Burns was "in police custody." Noel told Mr. Williams that he needed to pick up Burns in Georgetown. Williams told Noel that Burns had recently been hospitalized for a stroke and that it would take about an hour for him to get to Georgetown after his wife got home from church. Noel advised Williams to call Georgetown Police dispatch for "directions" when he got to Georgetown.

Mr. Williams arrived in Georgetown around 11:00pm. He had received no further communication from anyone prior to arriving in Georgetown. Once in Georgetown, Williams called the Georgetown Police dispatch and spoke to the same dispatcher with whom he had spoken earlier. The dispatcher informed him that Burns had been "dropped off" at a McDonald's restaurant at 171 Southgate Drive in Georgetown. Mr. Williams would later learn that Burns had been dropped off at the McDonald's by Georgetown police officer Enricco to wait for his ride back to London. Mr. Williams went to the restaurant but could not find Burns. No McDonald's employee had seen the police drop off anyone, and no one remembers seeing Burns, who was 6'2" and 300 pounds, at the restaurant. Mr. Williams drove around the area near the McDonald's

searching for Burns. He called the Georgetown police dispatch around midnight and spoke with the same dispatcher again. He gave the dispatcher his cell phone number. As Mr. Williams was nearing the interstate to head home, the dispatcher called him on his cell phone and gave him a number to call, saying only that "they have your brother-in-law." When Mr. Williams called, he discovered the number was the coroner's office. Burns had been struck and killed by a van just before midnight while he was walking "in the roadway" about two miles south of the McDonald's. The accident report indicated that Burns was "not visible" because he was dressed in dark clothing.

Burns's sister, Lisa Williams, is the administratrix of his estate and the plaintiff in this action. She filed suit in March of 2018, naming the City of Georgetown and its Chief of Police Michael Bosse, individually. She was subsequently granted leave to amend her complaint to add defendants Georgetown police officers Jon Noel and Tommy Enricco, as well as Scott County Deputy Sherriff Jeremy Nettles, Scott County Deputy Tony Hampton, all in their individual capacities, and Scott County, Kentucky.[1] The plaintiff claimed violations of Burns's rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983, alleging that it was objectively unreasonable, or alternatively deliberately indifferent, for the responding law enforcement officers to fail to give Burns medical attention at the scene and then to abandon him at the McDonald's after the stop. She also claimed failure to train and supervise on the part of the Georgetown Chief of Police, the Scott County Deputy, and the governmental entities.

The defendants moved to dismiss the complaint under Rule 12(b)(6). The District Court granted the motions as to all defendants on all the federal claims, and the state claims were dismissed without prejudice. *Williams v. City of Georgetown, Ky.*, No. 5:18-cv-00171-DCR, 2018

---

[1] Original defendants Nicholas Lodal, Gary Crump, and two Jane or John Does were voluntarily dismissed by plaintiff in her amended complaint.

WL 5793854 (E.D. Ky. Nov. 5, 2018). It determined that the Fifth and Eighth Amendment claims were inappropriate because Burns was not in police custody. *Id.* at \*\*6–7. As to the Fourth Amendment claim, the district court found that the traffic stop was based on probable cause. *Id.* at \*4. The court dismissed the Fourteenth Amendment claims because the officers were not deliberately indifferent to Burns's medical needs and the officers did not create a more dangerous situation for Burns by leaving him at the McDonald's instead of allowing him to continue to drive recklessly. *Id.* at \*4–6. The supervisory and municipal liability claims were dismissed because the district court found no underlying constitutional violation. *Id.* at \*7. On appeal, plaintiff challenges only the dismissal of the Fourteenth Amendment claims regarding the officers' conduct in failing to give Burns medical care and then dropping Burns off at a McDonald's. Our review of the District Court's dismissal is *de novo. See Reilly*, 680 F.3d at 622.

## II.    ANALYSIS

Qualified immunity shields an officer from liability under 42 U.S.C. § 1983 where that officer's conduct did not violate clearly established rights. *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016). Whether immunity should attach turns on whether a constitutional right has been violated and whether that right was clearly established. *Id.* The focus of this appeal is on two timeframes: when the officers pulled Burns over and called the emergency medical technicians, and when Burns was dropped off at McDonald's. The District Court concluded that qualified immunity should attach in this case because the officers did not violate the Fourteenth Amendment at either time. 2018 WL 5793854, at \*6 ("Because the plaintiff failed to assert facts indicating that the McDonald's restaurant was more dangerous than driving recklessly, and because she conceded that the officers summoned an ambulance while Burns was in their custody, the Court cannot reasonably infer that the officers violated the Fourteenth Amendment."). The

District Court also said that even if qualified immunity did not apply, dismissal would still be warranted. *Id.* at \*7 ("And if qualified immunity is ultimately not appropriate grounds for dismissal, dismissal is nonetheless appropriate because the plaintiff failed to assert sufficient factual matter to state a plausible claim that the officers violated Burns's constitutional rights pursuant to § 1983.").

As to the first timeframe, when Burns was pulled over, the question is whether the officers displayed deliberate indifference to the man they had detained. *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018). This inquiry traditionally examines an objective medical need alongside a subjective assessment of what medical risks the officer perceived (and presumably disregarded).[2] *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005). An officer fulfills his duty to promptly seek medical help by calling paramedics. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1097–98 (6th Cir. 1992). Here that is exactly what happened. The officers who stopped Burns summoned medical assistance, but Burns refused treatment—as was his right. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment."). Even assuming that Burns objectively needed medical treatment and that the officers subjectively perceived that need, they acted. 2018 WL 5793854, at \*5, n.4 ("The objective fact that the officers summoned paramedics establishes that the officers subjectively did not disregard the risk to Burns."). Thus, the officers are entitled to qualified immunity for their actions during the stop.

---

[2] The parties note that *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), may have altered this analysis. *See also Richmond v. Huq*, 885 F.3d 928, 938, n.3 (6th Cir. 2018) ("Nonetheless, we recognize that this shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether Richmond need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them."). We need not decide that issue.

The second timeframe, when the officers allegedly dropped Burns off at McDonald's, presents a closer question. Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). There are two exceptions to this rule: (1) the custodial exception, when the state has restricted the freedom of someone in police custody, and (2) the state-created danger exception. *See Cartwright v. City of Marine City,* 336 F.3d 487, 491 (6th Cir. 2003). The District Court below only analyzed the state-created danger avenue because Burns was not in police custody when he was killed several miles from the McDonald's. 2018 WL 5793854, at *6 ("Because Burns was not in custody at the time of the accident, only the state created danger theory is potentially applicable."). We have articulated the test for assessing a state-created danger as follows:

> To show a state-created danger, plaintiff must show: 1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Cartwright*, 336 F.3d at 493.

Here, the tragic harm visited upon Burns had nothing to do with the state. Burns was unquestionably safer at McDonald's waiting for a ride home than getting back in his car and driving home. *Id.* ("The question is not whether the victim was safer *during* the state action, but whether he was safer *before* the state action than he was *after* it.") (emphasis in original). In *Cartwright*, the inebriated decedent was transported by police from the foggy side of a Michigan highway to a convenience store. *Id.* at 489, 493. The police had simply offered him a ride, but when they discovered they had to transport a prisoner on the route, they told Cartwright he would have to submit to a pat-down to continue his free ride. *Id.* at 489. Like Burns's refusing medical

treatment, Cartwright had the right to refuse a pat-down. But that refusal left the officers in this case in the same "Catch–22" described in *Cartwright*. *Id.* at 494.

Instead of incarcerating him on potentially dubious grounds, the officers did Burns a favor and took him to a safer place while they resumed their duties. Dropping him at a well-lit restaurant decreased Burns's risk of causing harm or suffering it. That he chose to leave the McDonald's was not a choice the officers made. There is no allegation in the complaint that Burns resisted being dropped off. *Cf. Salyers v. City of Portsmouth*, 534 F. App'x 454, 458 (6th Cir. 2013). And we can hardly call a highway-side McDonald's "dark and dangerous" or "forlorn." *Davis v. Brady*, 143 F.3d 1021, 1025-26 (6th Cir. 1998) ("[T]he defendant officers in this case placed Davis in a more dangerous situation than he was prior to their interference, when they drove him outside the Flint city limits and abandoned him on a dark and dangerous highway in an unfamiliar area."). Nor is there a sequence of affirmative acts in this case that further endangered the decedent. *Stemler v. City of Florence*, 126 F.3d 856, 870 (6th Cir. 1997) ("They knew, or reasonably should have known, that Kritis was unfit to drive. They knew, or reasonably should have known, that Kritis had assaulted [the decedent] earlier in the evening and had threatened to hurt her. Nevertheless, they chose to act affirmatively to place her in harm's way.").

The plaintiff says that the custodial rubric should apply to this case instead of the state-created danger analysis. The officers' conduct here satisfied either standard. Although it is true that "an officer's duty exists even after the custodial relationship has ended," *Davis*, 143 F.3d at 1025, it does not extend in perpetuity. Plaintiff admits that the officers concluded Burns was not a danger to himself or others. Calling an ambulance and giving Burns a ride to McDonald's does not strike us as the deliberate indifference described in *Davis*. 143 F.3d at 1027; *see also Salyers*, 534 F. App'x at 460. There was no constitutional violation.

Finally, the plaintiff suggests that the officers' treatment of Burns was the result of their supervisors' policies and that municipal liability should attach. The District Court dismissed these claims because there was no underlying constitutional violation. 2018 WL 5793854, at *7. There is no allegation that defendant-supervisors were present the night of the incident or that they directed the misconduct. The District Court was correct.

### III.    CONCLUSION

Though tragic, these facts do not "betray[] a chilling and unacceptable vision of the role of the police in our society." *Stemler*, 126 F.3d at 870. We affirm.

MERRITT, Circuit Judge, dissenting. We review claims of qualified immunity to determine only whether the complaint "adequately alleges the commission of acts that violated clearly established law." *Back v. Hall*, 537 F.3d 552, 555 (6th Cir. 2008) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "At the pleading stage, [the plaintiff's] burden is carried by alleging facts plausibly making out a claim that the defendants' conduct violated a constitutional right that was clearly established at the time, such that a reasonable officer would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). Taking the facts alleged in the complaint in the light most favorable to plaintiff, she has adequately alleged deliberate indifference where the police had a duty to decedent that extended beyond his release from actual police custody due to his medical condition at the time. I would reverse the district court's grant of qualified immunity, and remand to the district court for further proceedings on the Fourteenth Amendment claim. I agree that the officers did not act with "deliberate indifference" to Burns' medical needs during the roadside stop of his vehicle because they called paramedics to the scene, but I part ways with the majority about whether plaintiff has adequately alleged that defendants were "deliberately indifferent" to Burns' welfare when they left him alone at night at a McDonald's in a strange city knowing that he appeared impaired in some way. The complaint adequately alleges that their decision led to Burns wandering out in the roadway and getting killed by a passing vehicle.

When the police take an individual into custody—into their control—substantive due process prevents them from intentionally or recklessly injuring the individual, whether that individual has been temporarily seized by an officer or is more permanently housed in a prison. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 127–28 (1992); *Davis v. Brady*, 143 F.3d 1021, 1024 (6th Cir. 1998). Where an arrestee suffers injury at the hands of a private party while

detained by the state, "a constitutional claim arises when the injury occurred as a result of the state's deliberate indifference to the risk of such an injury." *Davis*, 143 F.3d at 1026; *see also Stemler*, 126 F.3d at 870. Under these principles, the relevant question that should be examined is whether Burns was so obviously impaired when in the officers' custody that the officers acted with deliberate indifference in leaving him unsupervised in the middle of the night in a strange town to await a ride home.

Instead, the question the majority asks is whether Burns was safer before the state action than he was after it. *DeShaney*, 489 U.S. at 201. This is not the correct question because it sets up a false equivalency—as though the police had only a binary choice between putting him back in his car to drive home or bringing him to the McDonald's. Multiple other options were available, including taking Burns into custody to await a family member. The question also reveals the weakness in the argument because the comparison essentially concedes that the officers likely believed that Burns was too impaired to drive.

That fact that the officers knew that Burns was too impaired to be left alone comes primarily from their own observations as recorded in the police reports. The officers pulled Burns over for "reckless driving" such as swerving and almost running off the road; Burns was unable to locate his license and insurance upon request; Burns gave "inconsistent responses" to officers' questions and he could not explain why he was over an hour away from his home in London; when asked about a scab on his head, Burns related that he had fallen and had recently been hospitalized for a "neurological condition;" Burns told officers he had missed some of his prescribed medication that day; and, most telling, the officers were concerned enough about his condition to call emergency medical personnel, raising at least an inference that they understood that Burns might be seriously impaired.

It is unknown whether Burns requested to go to the McDonald's, was left there willingly or unwillingly, or whether he was competent to make a decision about where he could safely wait. Plaintiff hints that perhaps Burns was never even taken to the McDonald's when she stated that her husband went to the McDonald's and none of the employees remembers the police dropping off anyone that evening, or seeing anyone matching Burns' rather imposing physical description (6'2" and 300 pounds).

Our court has considered—and squarely rejected—the argument that officers cannot be liable for injuries that occur *after* the custodial relationship terminates. *See Davis*, 143 F.3d at 1025 (stating that "an officer's duty exists even after the custodial relationship has ended" and rejecting the officers' argument that they owed no duty of care to an individual they drove to a dark highway and abandoned, and the individual was subsequently hit by a car and injured). While this duty does not extend into perpetuity, the facts of this case raise a substantial question as to whether the duty extended a few hours to allow a family member safely to retrieve Burns.

Taken in the light most favorable to plaintiff, the allegations could support a finding that Burns was in a "custodial relationship" with officers when he was killed, and his death was caused by the officers' deliberate indifference to his medical condition and their decision to drop him off alone at the McDonald's. A number of factual questions exist about the officers' states of mind that evening, and their knowledge of what happened to Burns that led to his death on a highway miles away from where he was pulled over several hours previously. Even under the circumstances of this case as we know them now, at the motion-to-dismiss stage, a jury could find that the officers increased the risk of harm faced by Burns.

The complaint alleges sufficient information to demonstrate that the officers assumed a custodial duty to Burns to avoid acting with deliberate indifference to his safety to survive a motion

to dismiss. The law is sufficiently established that a reasonable officer would know not to leave an impaired person alone at night in a strange place. Plaintiff could discover evidence that at least creates a question of fact as to whether the officers violated this duty by acting with deliberate indifference when they dropped Burns off at McDonald's in a strange town late at night. At bottom, this is a case about responsible police action. Once police are involved, they cannot act with indifference to the welfare of the person before them.