**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0485n.06

Case Nos. 15-5698/5699/5711

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 17, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., as successor by merger to LaSalle Bank, N.A.; SMA ISSUER I, Bank of America, N.A., | ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | |
| THE DOMAINE DE LA RIVE CONDOMINIUM COUNCIL OF CO-OWNERS, INC., | ) ) ) ) | |
| Intervenor Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) ) | |
| CORPOREX REALTY & INVESTMENT CORPORATION, | ) ) ) | |
| Defendant-Appellant, | ) ) | |
| CPX OLYMPIC BUILDING II, LLC; CPX MADISON PLACE OFFICE, LLC, | ) ) ) | |
| Defendants. | ) ) | |

BEFORE: KEITH, COOK, and STRANCH, Circuit Judges.

COOK, Circuit Judge. Bank of America ("BOA") sued three Corporex-related entities to collect the balance of three defaulted commercial real estate loans and to foreclose on the

mortgaged properties. It also sued a fourth Corporex entity as guarantor of the loans.[1] Corporex in turn asserted various counterclaims against BOA concerning loan-extension negotiations that soured. After a bout of contentious discovery, Corporex moved to file a third round of amended counterclaims, which the district court denied. BOA then sought summary judgment on its breach-of-contract and foreclosure claims and on Corporex's counterclaims. The district court granted summary judgment to BOA on all claims, and Corporex now appeals.

We AFFIRM the district court's grant of summary judgment and denial of Corporex's motion to amend its counterclaims.

## I.

LaSalle Bank (predecessor-in-interest to BOA) made commercial real estate loans to three Corporex entities: CPX Olympic Building II, LLC ("Olympic"), CPX Madison Place Office, LLC ("Madison"), and CPX Tampa Gateway OPAG, LLC ("Tampa"). The loans are secured by a leasehold mortgage on three commercial properties and guaranteed by Corporex Realty & Investment, LLC ("Realty").

A covenant in the Madison loan, delivered and executed in October 2006, required Madison to achieve a debt-service-coverage ratio—which measures cash flow against current debt obligations—of at least 1.10 to 1.0 as of August 31, 2010. In August 2009, Corporex notified BOA that Madison would likely fall short of the required ratio. BOA recommended postponing an appraisal on the Madison property until the economy improved and advised that it would "work with" Corporex to extend and modify the Madison loan. In May 2010, the parties again met to discuss the debt-service-coverage-ratio covenant. BOA told Corporex that before it could consider loan extensions, Corporex needed to obtain an appraisal on the Madison property.

---

[1]For simplicity, we refer to the entities as "Corporex."

If the property appraised at a value equal to or more than the outstanding loan balance, BOA could "work around the debt service coverage issue." An appraisal in June revealed a property value greater than the loan balance.

Accordingly, the parties again conferred in August 2010, this time to additionally discuss the looming maturity dates of the Olympic and Tampa loans. At this meeting, Corporex divulged that it had considered refinancing options for the Olympic loan with another lender, but BOA executive David Betzold told Corporex to "hold off" on alternative funding, maintaining that BOA could offer a "better deal." BOA asked Corporex to submit an extension proposal for all three loans, which Corporex sent in early September.

While contemplating Corporex's proposal, BOA sent Corporex a letter stating that Madison failed to achieve the required debt-service-coverage ratio and that it had thirty days to cure the covenant breach by paying down the loan principal balance by $4.5 million. Confused, Corporex contacted BOA, who assured that the letter was a "matter of procedure" and that BOA still intended to respond to the September proposal.

On November 1, BOA tendered a counterproposal via "term sheets." The proposal explained that its provisions "are provided for discussion purposes only and . . . [do] not constitute an offer, agreement or commitment to lend or renew at this time." In the accompanying email, BOA employee Phil Cole pressed that "time is of the essence given the upcoming date for the right to cure in the [Madison] default letter." The term sheets offered Madison a fifteen-month extension paired with a $3 million up-front principal payment. Corporex responded, insisting that it needed a four-to-five year extension. A couple of weeks later, BOA sent Corporex a letter declaring the Madison loan in default.

In early December, BOA transferred the three Corporex loans from BOA's Commercial Real Estate section to its Special Assets Group ("SAG"). SAG employs a variety of tactics to deal with distressed loans, including extending or modifying the loans, selling the notes, or foreclosing on the mortgages. After the transfer, SAG employee Leslie Andren introduced herself to the Corporex executives and asked them to sign pre-negotiation letters (PNLs) before extension discussions could continue. All three Corporex entities signed the letters—and Realty signed as guarantor—which released any claims or defenses arising out of or relating to the loan-extension negotiations.

The Olympic and Tampa loans matured on February 1, 2011.[2] Still embroiled in negotiations, BOA sent Corporex a new round of term sheets on March 1, but attached letters declaring the Olympic and Tampa loans in maturity default.

By mid-April, the parties had agreed to basic extension terms on all three loans, and BOA completed its internal approval process the next month. Thus, BOA drafted final loan-extension agreements and sent them to Corporex for signing. Expecting simple documents similar to the term sheets, Corporex was displeased to find a complicated loan contract. Moreover, the drafts contained terms Corporex deemed burdensome, including a release of claims and jury-trial waiver. Corporex therefore responded with a June 22 letter protesting the new terms and informing BOA that it had "directed legal counsel to cease review of the documents." A subsequent conference call resulted in an agreement that Corporex would provide written objections to the additional terms. The next day, however, Corporex sent BOA a letter declaring

---

[2]BOA previously agreed to extend the maturity date on the Olympic loan from October 31, 2010 to February 1, 2011.

an impasse, and Corporex's counsel confirmed by email that it would not be sharing written objections. Loan discussions ceased.

Concurrently, in early June 2011, BOA pondered a sale of a large portfolio of loans—later named "Project Atlas." On July 26, the Madison loan appeared on a list of loans to be marketed in the Atlas sale. The addition of the Olympic and Tampa loans soon followed. In September, SMA Portfolio Owner, LLC ("SMA") bought the Olympic and Tampa loans. The Madison loan remains unpurchased and matured in October 2011.

BOA sued Realty, Madison, Olympic, and Tampa in several district courts to collect on the loans and foreclose on the properties. Each Corporex entity asserted various counterclaims, which they twice amended. After it purchased the Olympic and Tampa loans, SMA was substituted as plaintiff with respect to those loans and eventually settled with Olympic, Tampa, and Realty.

Thus, the relevant claims that survived the SMA settlement were: (1) BOA's claims against Madison for breach of the promissory note and to foreclose on the mortgage and against Realty for breach of the Madison guarantee; (2) Olympic's counterclaim against BOA for breach of a contractual right of first refusal; (3) Olympic's and Realty's counterclaims against BOA for promissory estoppel; and (4) Olympic's, Madison's, and Realty's counterclaims against BOA for breach of the implied duty of good faith and fair dealing.

Following discovery, Corporex proposed third amended counterclaims of fraud and negligent misrepresentation, but the district court denied leave on untimeliness grounds. BOA then moved for summary judgment on its claims and on Corporex's counterclaims. The district court granted summary judgment to BOA on all claims. It dismissed the right-of-first-refusal claim for failure to show that BOA determined to sell the Olympic loan before Olympic

defaulted and held that the PNLs released Corporex's promissory-estoppel and good-faith-and-fair-dealing claims. The court then found no triable issue of fact regarding Madison's default and thus granted summary judgment to BOA on its claims against Madison and Realty. This appeal followed.

## II.

We review de novo the district court's grant of summary judgment, affirming if the evidence demonstrates that no genuine issue exists as to any material fact and that BOA is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). A dispute is "genuine" if a reasonable jury could return a verdict in Corporex's favor. *Tysinger*, 463 F.3d at 572 (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004)). "The court must view the evidence in the light most favorable to [Corporex] and draw all reasonable inferences in its favor." *Id.*

### A. Corporex's Counterclaim for Breach of the Olympic Right of First Refusal

Corporex asserts that BOA breached the contractual right of first refusal contained in the Olympic loan agreement. That agreement provides:

> Lender agrees that in the event that it determines to assign or sell the Note or any portion thereof to any person or entity not affiliated with Lender, Lender shall, provided Borrower is not then in default under this Note or any of the other Loan Documents, allow Borrower or Borrower's affiliates a right of refusal to purchase same . . . .

Corporex maintains that BOA determined to sell the Olympic loan prior to the loan's default in March 2011. BOA responds that it decided to sell the loan no earlier than June 2011, when BOA first conceived of Project Atlas. Because this decision occurred after Olympic defaulted, BOA insists that Corporex had no right of first refusal under the contract.

We agree with BOA that no reasonable juror could conclude that BOA determined to sell the loan before the March default extinguished Corporex's right of first refusal. Corporex relies heavily on BOA's decision in November 2010 to internally downgrade the Corporex loans from a "Decrease" exposure-strategy designation to an "Out" designation. BOA's internal emails define the "Out" designation: "Credit exposure is unacceptable at any level. New requests should not be entertained nor existing loans renewed *except as a means to accomplishing a complete payout*." BOA executive Betzold testified that such a designation change meant that BOA "would continue to work through the existing portfolio, modify and extend, but [would] not want to entertain any new business."

Corporex directs the court to the testimony of a different BOA executive, Joseph Fuszard, who also described the exposure-strategy designations: "[T]hose descriptors are intended to signal whether we are increasing our business with that client, maintaining it at a particular level, decreasing it to a set level, or allowing it to run out completely." But "allowing it to run out completely" must be read in the context of Fuszard's further clarification of the "Out" designation: "It simply means that when the current exposures have been repaid, they won't be replaced with any new." None of the definitions BOA used to describe the "Out" exposure strategy reveal a determination to sell the note.

Corporex argues for the first time on appeal that its negotiations with BOA "had never been a 'means of accomplishing a complete payout'" and thus the "Out" designation as applied to Corporex meant BOA decided to sell the loans. But Corporex's own communications to BOA assure that the loan extensions would allow for complete repayment of the loan at the close of the extension term. (R. 251-14 ("With a five-year runway, we are prepared to commit whatever

resources are reasonably necessary to ensure full pay off . . . .").) Indeed, nothing in the record shows that the negotiations contemplated loan forgiveness or new loan transactions.

Next, Corporex insists that BOA's transferring the loans to SAG in December 2010 evidences a decision to sell. But the record belies Corporex's assumption that SAG deals only in loan sales. Andren testified that SAG could modify loans, foreclose, grant deeds in lieu of foreclosure, do discounted payoffs, and could sell the notes, but that "no one method . . . was preferred." Another SAG employee, Gary Katunas, explained that loan sales are "something we use from time to time" but are not "a high priority in terms of how we deal with assets." Corporex provides no evidence to rebut this testimony.

In fact, the record shows that the earliest point at which BOA may have determined to sell the Olympic loan was in June 2011, when Fuszard circulated a memo regarding a potential bulk loan sale, i.e., Project Atlas. The Olympic loan was not added to the Atlas portfolio until August 2. Accordingly, no reasonable juror could conclude that BOA determined to sell the Olympic loan before its March 2011 default. And, because Corporex's right of first refusal was never triggered, the district court properly dismissed this claim.

### B. The PNLs Bar Corporex's Promissory-Estoppel and Good-Faith-and-Fair-Dealing Counterclaims

In alleging promissory estoppel, Corporex claims that it detrimentally relied on BOA's promise to work with Corporex to extend the terms of the Olympic loan by passing up on other refinancing opportunities. To support its claim that BOA breached its implied duty of good faith and fair dealing, Corporex theorizes that BOA misrepresented its interest in negotiating loan extensions in order to push the loans into maturity default. The defaults then allowed BOA to sell the loans to a third party free of Corporex's rights of first refusal.

Both claims are barred by the PNLs. The PNLs release the parties from "any and all liabilities, claims and demands whatsoever, in law or in equity, which such releasing party now has or may hereafter have against the other party caused by or arising out of or relating to all or any Loan Communications." The parties also released "any defense to any action by any other party . . . based on any Loan Communications." The letters define "Loan Communications" as "[a]ny discussions, negotiations, correspondence and other communications relating to the Loan and the Loan Documents that Borrower, Guarantor and/or their representatives may have previously had, or in the future may have, with representatives of Lender." Corporex's promissory-estoppel and good-faith-and-fair-dealing claims rely on Loan Communications and so fall within the scope of the PNLs' release.

Corporex therefore attacks the PNLs' validity and argues that, even if they are valid, they do not release the claims.

As a preliminary matter, the PNLs dictate that Kentucky law controls. Though Corporex argues that the PNLs' choice-of-law provisions would not necessarily govern arguments that challenge the PNLs' enforceability, it admits that Kentucky law mirrors Ohio law in all relevant respects. This congruity renders a choice-of-law analysis unnecessary. *See CenTra, Inc. v. Estrin*, 538 F.3d 402, 409–10 (6th Cir. 2008). Thus, like the parties, we examine both Ohio and Kentucky law. *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1171 (11th Cir. 2009) (examining "the law of each of the interested states" when the states' laws are the same).

1. The PNLs are Valid

Corporex deems the PNLs invalid both for lack of consideration and because BOA fraudulently induced Corporex to sign them. Both arguments fail.

### a. Consideration

A release, like any contract, must be supported by consideration. *Waddle v. Galen of Ky., Inc.*, 131 S.W.3d 361, 365 (Ky. Ct. App. 2004). "Mutual promises constitute adequate consideration *if* a benefit is conferred to the promisor or a detriment is incurred by the promisee." *Energy Home Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013) (citing *More v. Carnes*, 214 S.W.2d 984, 991 (Ky. 1948)); *accord Lake Land Emp't Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 32 (Ohio 2004).

BOA contends that its agreement to discuss a loan extension in lieu of immediately suing upon default served as valid consideration. We agree.

A promise to withhold the filing of a lawsuit, even for a brief period of time, constitutes adequate consideration. *See Kidd v. Kidd*, No. 06CA119, 2007 WL 2206859, at *3 (Ohio Ct. App. Aug. 2, 2007) ("We find even the minimal forbearance of a partition action for sixteen months is consideration as it was 'something of value.'" (citing *Yardmaster, Inc. v. Orris*, No. 9-305, 1984 WL 7415 (Ohio Ct. App. June 29, 1984))); *cf. David Roth's Sons, Inc. v. Wright & Taylor, Inc.*, 343 S.W.2d 389, 391 (Ky. 1961) ("If both parties are bound by mutual obligations for even a short period of time, the contract cannot be avoided by either party [for lack of consideration]."). Courts in other states have held that an agreement to negotiate when there is no legal obligation to do so constitutes sufficient consideration. *See, e.g.*, *In re Vargas Realty Enters., Inc.*, 440 B.R. 224, 236–37 (S.D.N.Y. 2010) (listing New York cases). We therefore conclude that an agreement by BOA to negotiate a loan extension instead of immediately suing Corporex serves as adequate consideration to support the releases.

Corporex insists that BOA never promised to negotiate. It cites the PNLs' language stating that BOA had no obligation "to *discuss*, pursue or agree to any modifications, consents or

approvals or assumptions of the Loan." Moreover, it argues, either party could discontinue negotiations at any time upon notice. Thus, it labels BOA's agreement to negotiate an illusory promise. *See Imbrogno v. Mimrx.com, Inc.*, No. 03AP-345, 2003 WL 22707792, at *2 (Ohio Ct. App. Nov. 18, 2003) ("A contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance . . . ." (citing *Century 21 Am. Landmark, Inc. v. McIntyre*, 427 N.E.2d 534, 534 (Ohio Ct. App. 1980))); *see also RAM Eng'g & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 586 (Ky. 2003) ("Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration."). BOA responds that, by the terms of the PNLs, it *did* agree to negotiate: "Lender *will discuss* the Loan with Borrower's and Guarantor's representatives, provided that the following agreements and understandings govern." And BOA notes that it, in fact, negotiated a possible extension for several months, refraining from immediately suing to foreclose.

The terms of the PNLs are indeed contradictory concerning whether BOA had any obligation to discuss a loan extension. The court therefore must examine the surrounding circumstances to determine the parties' intent. *See Fouty v. Ohio Dep't of Youth Servs.*, 855 N.E.2d 909, 925 (Ohio Ct. App. 2006) ("[W]hen contracts contain ambiguous or conflicting terms, it is proper for a court to consider 'extrinsic evidence,' i.e., evidence outside the four corners of the contracts, in order to determine the parties' intent." (quoting *Shifrin v. Forest City Ents., Inc.* 597 N.E.2d 499 (Ohio 1992))); *Cent. Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981) (holding that if the terms of a contract are ambiguous, "then extrinsic evidence may be resorted to in an effort to determine the intention of the parties").

The record shows that BOA agreed to forgo immediate suit in favor of negotiating an extension. (*See* R. 232-22 (Andren insisted that Corporex sign the PNLs before she could send updated term sheets); R. 232-44 (Andren told Corporex that "in order to move forward with negotiations" Corporex needed to sign the PNLs).) The parties signed the PNLs after the loans defaulted, and BOA then continued to negotiate for months. *See Sellars v. Jones*, 175 S.W. 1002, 1003 (Ky. 1915) ("[A]n actual forbearance to sue may often, in connection with other circumstances, sometimes slight, be evidence of an implied agreement to forbear, and thus form a consideration for a promise."); *Klamo v. Hobbs*, No. 83-02-019, 1983 WL 4438, at *2 (Ohio Ct. App. Aug. 10, 1983) ("[A]ctual forbearance or promise to forbear to prosecute or pursue a legal right or a claim on which one has a right to sue is sufficient consideration to support an agreement."). And Corporex itself argues that BOA promised Corporex that it would negotiate an extension in good faith. Thus, the parties' understanding shows that Corporex signed the release in exchange for BOA's promise to negotiate a loan extension in lieu of immediately pursuing its contractual remedies. Adequate consideration supports the PNLs.

### b. Fraudulent Inducement

Corporex next seeks to void the PNLs because BOA fraudulently induced it to sign them. In Kentucky and Ohio, "a release of liability procured by fraud is voidable." *Ziegler v. Knock*, Nos. 2008–CA–002160–MR, 2008–CA–002370–MR, 2013 WL 189793, at *2 (Ky. Ct. App. Jan. 18, 2013) (citing Kentucky and Ohio case law). The party asserting fraud must show, by clear and convincing evidence, "that it reasonably relied on a representation that was material, false, known to be false or recklessly made, and made with the intent of inducing another to act or refrain from acting." *Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 444 (6th Cir. 2014) (citing *Ross v. Powell*, 206 S.W.3d 327, 330 (Ky. 2006)); *see also Cross v.*

*Ledford*, 120 N.E.2d 118, 122 (Ohio 1954). Generally, the misrepresentation must relate to a past or existing fact. *See Crestwood*, 751 F.3d at 444 (citing *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App. 2007)); *Williams v. Edwards*, 717 N.E.2d 368, 374 (Ohio Ct. App. 1998). If it relates to promises or representations concerning future action or conduct, the party claiming fraud must show that the other party, at the time it made the promise, had "no intention of keeping" it. *Williams*, 717 N.E.2d at 374 (citing *Tibbs v. Nat'l Homes Constr. Corp.*, 369 N.E.2d 1218, 1223 (Ohio Ct. App. 1977)); *see also Major v. Christian Cnty. Livestock Market, Inc.*, 300 S.W.2d 246, 249 (Ky. 1957).

No reasonable juror could find by clear and convincing evidence that BOA had "no intention" of discussing a loan extension when Corporex signed the PNLs. *See Williams*, 717 N.E.2d at 374. The evidence—even when viewed in a light favorable to Corporex—reveals unsuccessful negotiations between two sophisticated parties, not a secret plot by BOA to feign negotiations in an attempt to drag the loans into default.

First, as previously explained, the record is devoid of evidence showing that BOA planned to sell the loans before engaging in negotiations. In fact, the parties negotiated for months after BOA declared the loans in default and Corporex's rights of first refusal evaporated. Seeking to fend off this conclusion, Corporex presses that BOA's advice to decline third-party refinancing for the Olympic loan evidences BOA's plan to bundle all three loans for sale. But this argument asks the court to infer that BOA passed up an opportunity to be paid in full from the refinancing so that it could later sell the loan at a loss. At summary judgment, we "will not draw such unreasonable inferences." *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006) (citing *Willis v. Roche Biomed. Labs., Inc.*, 21 F.3d 1368, 1380 (5th Cir. 1994)); *see also Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 323 (6th Cir. 2012) ("[W]e need

not make assumptions that strain credulity." (citing *Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 659 (7th Cir. 1991))).

The record does expose BOA's skepticism that the parties would ultimately agree on loan modifications. After internally circulating the initial counterproposal, BOA employee Phil Cole explained to a colleague: "I really don't think this is a solution, more an attempt to show that [the Commercial Real Estate group] thought about it prior to starting the transfers [to SAG]." Internal documents accompanying the loans' transfer to SAG signal that an extension was unlikely. And shortly after the transfer, Andren drafted an internal report projecting foreclosures on the Madison and Tampa mortgages.

Other evidence, though, reveals the reasons for these forecasts. Both Andren and Cole testified that Corporex executives were tough negotiators and difficult to work with. During the internal approval process of the last agreed-upon term sheets, a BOA employee lauded the SAG team for accomplishing a deal: "This is a really big win for your team considering the prior dire outlook due to uncooperative Sponsors." These communications show that BOA initially doubted the success of loan negotiations, not that BOA committed fraud when it promised to discuss an extension.

Corporex also directs the court to evidence showing that BOA was prepared to pursue its contractual remedies if negotiations fell through. BOA sent Corporex notices of default during the negotiations so as to preserve its right to sue. Also, after sending Corporex the final draft loan modifications, Andren instructed BOA's attorneys to "immediately start the suits of the guarantor." As the district court recognized, "there is nothing nefarious or unusual about a commercial entity having a backup plan in the event negotiations fail." Indeed, the record confirms that Corporex executives understood that if negotiations proved unsuccessful,

foreclosure would soon follow. (R. 232-43 (Corporex executive Bill Butler telling fellow executive Nick Heekin that "my intent is to put [BOA] in such a position that in the event of [a] foreclosure action, they will have to defend their unreasonableness."); *Id.* (Butler explaining that Andren "constantly threw the word foreclosure around in the course of conversations" and was "always talking about her remedies.").)

The remaining evidence establishes that BOA negotiated from a position of strength and refused to extend the loan on less-than-favorable terms. Early in the negotiations, a BOA executive issued a directive to "get ours first for CPX," and an employee replied: "Agree. We are first at [the] table." Additionally, BOA required that Corporex sign the PNLs containing release language and added similar terms to the draft loan modifications. Corporex executive Nick Heekin testified that nearly every lender Corporex worked with included release provisions in loan documents. And though BOA requested written objections to the terms Corporex deemed onerous, Corporex declined and ended negotiations.

Simply put, the record evidences BOA's hardline stance in negotiations. But no reasonable juror could find by clear and convincing proof that BOA had no intention of negotiating a loan extension when Corporex signed the PNLs. We uphold the PNLs' validity as against Corporex's allegation of fraudulent inducement.

2. The PNLs Release Corporex's Promissory-Estoppel and Good-Faith-and-Fair-Dealing Counterclaims

Invoking two related arguments, Corporex next contends that, even if the PNLs are valid, they release none of Corporex's claims. First, it invites the court to look beyond the PNLs' plain terms and consider the surrounding circumstances to determine that Corporex never intended—when it signed the PNLs—to release its claims against BOA for promissory estoppel and breach

of the duty of good faith and fair dealing. Second, it posits that a party cannot release claims of which it was unaware at the time of signing a release, particularly where the opposing party concealed the factual basis for the claims.

In support of its first argument, Corporex cites *Sloan v. Standard Oil Co.*, 203 N.E.2d 237, 240 (Ohio 1964), where the Ohio Supreme Court explained that "the wording of the release is not conclusive; it is a question of fact whether the parties to a release actually intended to discharge . . . liability." *Sloan*, however, involved rescission based on the doctrine of mutual mistake. *Id.* at 239–40; *see also Seals v. Gen. Motors Corp.*, 546 F.3d 766, 771 (6th Cir. 2008) ("*Sloan* applies to efforts to avoid a release on the grounds of 'mutual mistake.'").

Regardless, the Ohio Supreme Court has since held that "courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement," and "[o]nly when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992) (citing *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987)). In *Shifrin*, the court refused to consider extrinsic evidence to alter the terms of releases where the releasing party failed to demonstrate fraud, mutual mistake, or existence of an ambiguity on the face of the release. *Id.* at 502.

Similarly, the Kentucky Supreme Court has held that "courts must look to the language of the release to determine the parties' intentions" and "[w]hen no ambiguity exists in the contract, we look only as far as the four corners of the document to determine that intent." *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006) (internal citations omitted). "The fact that one party may have intended different results . . . is insufficient to construe a

contract at variance with its plain and unambiguous terms." *Id.* (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)); *see also 3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005).

Here, Corporex fails to demonstrate fraud or patent ambiguity in the release language, and it never argued below or on appeal that the releases are invalid on mutual-mistake grounds. Thus, both Ohio and Kentucky law counsel against Corporex's request for the court to disregard the unambiguous release terms.

Second, Corporex insists that the law prevents the PNLs from releasing claims "of which Corporex was ignorant due to BOA's deception." In support, it relies on two cases that applied federal law, not the law of Ohio or Kentucky. *Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 263 (6th Cir. 1988) (applying federal contract law in a copyright infringement action); *Knoth v. Ill. Cent. R.R.*, No. 2005-CA-001882-MR, 2006 WL 1510782, at \*1 (Ky. Ct. App. June 2, 2006) (applying federal law in considering the validity of a release under the Federal Employer's Liability Act). Corporex also relies on *Creson v. Carmody*, 222 S.W.2d 935 (Ky. 1949), and *Isroff v. Westhall Co.*, No. 14184, 1990 WL 15192 (Ohio Ct. App. Feb. 21, 1990). But in *Creson*, the court did not consider a written release and so there was no document from which to ascertain the parties' intent. 222 S.W.2d at 935–36. In *Isroff*, the court, relying in part on *Sloan*, concluded that the breach-of-fiduciary-duty claim did not fall within the scope of the release. As we explained above, the Ohio Supreme Court itself later held in *Shrifin* that the "intent of the parties . . . . reside in the language they cho[o]se in [an] agreement." 597 N.E. 2d at 501.

The PNLs' unambiguous language releases Corporex's claims for promissory estoppel and breach of the implied duty of good faith and fair dealing, warranting summary judgment.

### C.  BOA's Claims Against Corporex Regarding the Madison Loan

Because BOA sold the other loans, BOA seeks foreclosure only on the Madison mortgage.  It also requests the amount due on the Madison promissory note.  The parties do not appeal the district court's determination that Ohio law applies.  *See Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003).

On its foreclosure claim, BOA must show (1) execution and delivery of the note and mortgage, (2) a valid recording of the mortgage, (3) default, and (4) an amount due.  *First Nat'l Bank of Am. v. Pendergrass*, No. E-08-048, 2009 WL 1865127, at *3 (Ohio Ct. App. June 30, 2009) (citing *Neighborhood Hous. Servs. of Toledo, Inc. v. Brown*, No. L-08-1217, 2008 WL 5147452, at *3 (Ohio Ct. App. Dec. 5, 2008)).  Corporex leaves unchallenged the district court's conclusion that BOA has met these foreclosure elements.

Furthermore, Corporex makes no argument that it complied with the terms of the promissory note by curing its default.  This failure to cure constitutes an "Event of Default" under the loan, allowing BOA to accelerate the note terms to require full payment.  And Realty "unconditionally and irrevocably" guaranteed the Madison loan.

Instead, Corporex asks the court to estop BOA from accelerating the note payment terms and foreclosing on the mortgage because BOA's wrongful actions caused its defaults.  More specifically, it claims that, absent BOA's intentional misrepresentations, Madison would have made the $4.5 million debt-service-coverage payment—thereby avoiding the first default.  But as the district court recognized, "that does not excuse Madison's . . . continued failure to repay the loan nearly four years after it matured."

Corporex also presses that BOA's wrongful conduct caused Madison to lose its anchor tenant because a loan extension would have allowed Madison to offer the tenant better terms.

The tenant's departure, Corporex claims, caused the Madison loan's second default. But BOA had no obligation to extend the loan, and good-faith negotiations alone would not have aided Madison in obtaining a new lease agreement.

In its reply brief, Corporex admits that it "is not asking to be excused entirely from paying the loan." Instead, "it seeks damages for BOA's breaches and requests that those damages be set-off against any amount due BOA." As previously explained, Corporex's counterclaims fail, foreclosing any right to set-off the amount due. BOA merits summary judgment on its foreclosure and breach-of-contract claims against Madison and its breach-of-guarantee claim against Realty.

### D. The District Court's Denial of Leave to Amend

Finally, Corporex appeals the district court's denial of its motion to thrice amend its counterclaims to include fraud and negligent misrepresentation. The district court adopted the magistrate judge's Report and Recommendation denying the motion as untimely and prejudicial.

We review the district court's denial of leave to amend a complaint for an abuse of discretion, reversing only if left with "a definite and firm conviction that the trial court committed a clear error of judgment." *Leary v. Daeschner*, 349 F.3d 888, 904 (6th Cir. 2003) (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)). Ordinarily, a district court "should freely give leave [to amend the pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). But when a plaintiff moves to amend after a court-ordered deadline, the plaintiff must demonstrate "good cause" under Fed. R. Civ. P. 16(b)(4) for failure to seek leave earlier. *Leary*, 349 F.3d at 907. "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (quoting *Bradford v. DANA Corp.*, 249 F.3d 807, 809

(8th Cir. 2001)). We must also consider whether the opposing party will suffer prejudice as a result of the amendment. *Id.*

1. Diligence

Corporex offered its third amended counterclaims on August 21, 2014—over a year-and-a-half after the deadline to amend pleadings expired and two weeks before the dispositive-motion deadline.

Corporex had all of the evidence it cited in support of its motion by October 7, 2013. Most of the documents had been produced the previous summer. In its reply to BOA's opposition, Corporex for the first time relied on loan modifications BOA signed with other borrowers, documents not produced until June 17, 2014. It now maintains that "it was not until BOA produced [these modification documents] that Corporex confirmed the full extent of BOA's fraudulent intent." These documents were necessary, it argues, to meet the heightened pleading standard for fraud claims under Fed. R. Civ. P. 9(b).

Corporex's argument shows no abuse of discretion for several reasons. First, Corporex was unconstrained by Rule 9(b), as that rule allows plaintiffs to plead fraudulent intent generally. Fed. R. Civ. P. 9(b). Moreover, a negligent-misrepresentation claim requires no showing of fraudulent intent. *See Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580 (Ky. 2004); *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989). Second, the loan modification documents add little to Corporex's fraud and negligent-misrepresentation claims, as evidenced by its failure to rely on them in its motion to amend and in opposing summary judgment. Third, Corporex's new claims rely on the same theory of misrepresentation advanced in support of its second amended counterclaims. *See Salyers v. City of Portsmouth*, 534 F. App'x 454, 461 (6th Cir. 2013) (finding no abuse of discretion in denying leave to amend

- 20 -

where "Plaintiff knew of the facts and law undergirding th[e] proposed amendment long before the district court's deadline for amending pleadings"); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (finding no abuse of discretion where "[t]he plaintiff was obviously aware of the basis of the claim for many months, especially since some underlying facts were made a part of the complaint").

Still, Corporex persists that the district court's discovery stay caused the untimely filing. The district court stayed discovery from September 2013 to March 2014, ordering the parties to submit to mediation. But Corporex fails to explain why it neglected to assert these new claims after it received the bulk of relevant discovery in the summer of 2013—before the stay—or after the district court lifted the stay in early 2014.

2. Prejudice

The district court also found that the late amendment would prejudice BOA because the new claims would require the court to reopen discovery and postpone the dispositive-motion deadline. *See Gormley v. Precision Extrusions, Inc.*, 174 F. App'x 918, 921 (6th Cir. 2006) ("We have repeatedly held that allowing amendment after the close of discovery creates significant prejudice."); *Duggins*, 195 F.3d at 834 ("Allowing amendment at this late stage in the litigation would create significant prejudice to the defendants in having to reopen discovery . . . .").

Corporex insists that, "[b]ecause this case has always been about BOA's false statements," BOA already conducted discovery on the new claims. BOA correctly responds, however, that Corporex seeks punitive damages for its new tort claims. If amendment were permitted, BOA would need additional discovery regarding the various punitive-damages factors. Ky. Rev. Stat. § 411.186(2); *see also Hance v. BNSF Ry. Co.*, No. 15–5858, 2016 WL

1391842, at *8 (6th Cir. Apr. 8, 2016) (holding that an amendment would prejudice the opponent because it never conducted discovery on the issue of liquidated damages), *petition for cert. filed*, (U.S. July 18, 2016) (No. 15-5858); *Leary*, 349 F.3d at 908–09 (holding that reopening discovery on the issue of damages would prejudice the opponent).

### III.

We AFFIRM the district court's grant of summary judgment to BOA and denial of Corporex's motion to amend.