NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0410n.06

Case No. 17-4111

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 15, 2018
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| BOLSON MATERIALS INTERNATIONAL CORPORATION, originally named as Bolson Materials International, Inc., <br><br> Plaintiff-Appellant, <br><br> v. <br><br> 3D SYSTEMS CORPORATION; VILLAGE PLASTICS COMPANY, <br><br> Defendants-Appellees. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br> _____/    ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |

Before: MERRITT, WHITE, and DONALD, Circuit Judges.

MERRITT, Circuit Judge. In this breach of contract action, Plaintiff Bolson Materials International Corporation appeals summary judgment entered in favor of Defendants 3D Systems Corporation and Village Plastics Company. We reverse, finding that a genuine issue of material fact exists as to the meaning of a key contractual term.

This case concerns the sale of three-dimensional ("3D") printing supplies. Whereas an inkjet printer prints two-dimensional images on a flat surface such as paper, a 3D printer constructs a product in three dimensions, like a sculpture, out of a solid material—typically plastic. All parties involved in this case are in the business of selling 3D printing "filaments"—threads of specialized plastic 3D printing material. Functionally, filaments are to a 3D printer what ink is to an inkjet printer.

Plaintiff Bolson is a Canadian aftermarket seller of 3D printing filaments. Defendant Village Plastics is an Ohio-based manufacturer of 3D printing filaments. In 2008, Bolson and Village entered into a Non-Disclosure and Non-Compete Agreement ("Agreement") governing Village's manufacture and sale of specialized filaments produced per Bolson's specifications. From 2008 onward, Village also sold 3D printing filaments to other customers, including resellers. In 2013, Village was acquired by Defendant 3D Systems, a South Carolina corporation. Village continued to operate as a wholly-owned subsidiary of 3D Systems. Following the deterioration of Bolson's business relationship with Village, Bolson sued the Defendants in June 2014, alleging— alongside a litany of other claims—that Village's sales to resellers breached the Non-Compete Agreement. 3D Systems counterclaimed for Bolson's unpaid account balance. After years of litigation, the district court entered summary judgment against Bolson.

Bolson appeals, arguing that the district court erred in granting summary judgment on Bolson's breach of contract, contamination, and delay claims, as well as 3D Systems' counterclaim. Bolson additionally argues that the district court erred by granting summary judgment without allowing Bolson a reasonable opportunity for discovery.

We reverse the district court's grant of summary judgment on Bolson's breach of contract claims. At its core, this is a case about contract interpretation. The parties' Agreement contains an undefined and ambiguous technical term: "Fused Deposition Method" ("FDM"). Bolson's evidence establishes a genuine issue of material fact as to the parties' intended meaning. Thus, summary judgment is improper, and we remand these claims for further proceedings in the district court. However, we affirm the district court as to the remainder of Bolson's claims and 3D Systems' counterclaim.

## I.

A 3D printer fabricates plastic objects based on digital models. In the late 1980s, Stratasys, Ltd.—not a party to this case—developed and patented a 3D printing technique known by the trademarked term "fused deposition modeling," abbreviated "FDM." The Stratasys patent expired in 2009, but Stratasys retains the "FDM"-related trademarks today.

In brief, "fused deposition modeling" works as follows. First, a computer sends a digital blueprint to the 3D printer. Inside the printer, spools of plastic thread—the aforementioned

"filaments"—feed into the printer nozzle, which melts the filaments into a semi-liquid plastic. This plastic flows from the nozzle—like ink from a pen—onto a flat surface. There, the plastic immediately hardens, forming the first layer of the desired object. The printer then builds another plastic layer on top of the first, and so on, until the digital model has been fully reproduced, layer-by-layer, in physical form. The attached diagram depicts the mechanisms relevant to this opinion.[1]



Just as an empty inkjet printer requires ink cartridge refills, an empty 3D printer requires replacement filaments. In addition to the 3D printers themselves, Stratasys sold filaments for use in its machines. Starting in 2004, Stratasys attempted to eliminate competition by programming certain computer chips inside of its printers to reject third-party filaments. If you owned a Stratasys printer with this chip installed, you would have to buy Stratasys-brand filaments.

---

[1] The diagram is based upon the Stratasys patents and other diagrams in the record.

Canadian citizen Tim Heenan learned how to reprogram these Stratasys chips. Heenan was the president and sole officer of Bolson Materials International Corporation, which he operated out of a residence in Canada. Bolson found its niche in the 3D printing market selling corporate customers reprogrammed Stratasys chips which enabled the machines to use third-party filaments. Alongside these reprogrammed chips, Bolson sold its own line of filaments based on reverse-engineered Stratasys products.

However, while he could reprogram the chips himself, Heenan lacked the means to manufacture his own filaments. Bolson needed a regular supplier who could produce filaments that simulated the precise chemical and physical properties of the Stratasys products. Over the next few years, Bolson tested filaments from a number of vendors, including Village Plastics, a family-owned, Ohio-based company.

When Bolson approached Village in 2007, Village sold a variety of filaments marketed to 3D printing hobbyists. At the time, the Stratasys patent still remained in effect, and most hobbyists could not afford the price tag of the industrial-scale Stratasys machines. Online communities of 3D printing hobbyists designed kits which enabled aspiring hobbyists to assemble their own printers at home. Village catered to the needs of this hobbyist market.

In 2008, Village agreed to become Bolson's regular supplier. The parties entered a Non-Disclosure and Non-Compete Agreement, governed by Ohio law. Bolson agreed to provide Village with confidential information concerning Bolson's filaments, and Village agreed to keep Bolson's secrets and not to compete with Bolson's business. Confusion over the precise contours of the inartfully drafted Agreement eventually led to the instant case.

A year later, in 2009, the Stratasys patent expired, opening the floodgates to commercial imitators. Village began selling filaments to resellers servicing the burgeoning hobbyist market. Meanwhile, Bolson and Village continued to develop several lines of filaments for Bolson's clients in the European automotive industry.

By 2012, the symbiotic relationship between Village and Bolson had begun to deteriorate. Bolson had made a habit of submitting late payments. In September, Bolson's customers in the European automotive industry started complaining that Bolson's filaments were malfunctioning, and the fallout allegedly cost Bolson tens of thousands of Euros in lost revenue. Making matters

worse, a flood devastated the Village facility in the summer of 2013, ruining Village's inventory, shutting down production, and delaying shipments.

On October 9, 2013, Bolson placed a purchase order with Village—the last Bolson would make. Village refused to release any new shipments until Bolson paid its 90-days past due balance. On November 18, Bolson informed Village that Bolson had commissioned a laboratory report confirming that its filaments had been contaminated by a type of plastic Village produced for other customers. Bolson accused Village of selling contaminated products and demanded a $36,515.00 credit as compensation. Bolson also claimed that Village had prioritized other customers' shipments in reprisal for Bolson's late payments.

In the brief negotiations that followed, Village suggested alternative explanations for Bolson's claims. Village's Vice-President of Operations ultimately told Bolson that Bolson "could blame it on Village Plastics" but that the company had never guaranteed that a particular product would work in Bolson's customers' "specific application[s]." Dismissing the "blame game" as "counterproductive," Village offered a $30,000.00 credit contingent on Bolson releasing Village from any contamination or delay claims. Bolson accepted.

Village's attorneys began drawing up the Release in November 2013. Village told Bolson that it would like to take this opportunity to update the parties' 2008 Agreement with revised terms explicitly limiting the Agreement to cover only Bolson's Stratasys-compatible filament. Bolson suggested they finalize the Release first. The parties haggled over the terms of the Release and ultimately agreed that Village would apply the $30,000 credit to Bolson's outstanding account balance of $68,531.79, and Bolson would pay the remainder within 60 days.

With the Release out of the way, Village turned its attention to the revised non-compete terms. Bolson expressed a willingness to sign the revised terms pending consultation with counsel. Village pressured Bolson to return the revised terms by December 3, 2013. When Bolson questioned the urgency, Village threatened to end the business arrangement, citing the "prohibitive[ ]" cost of international collections.

On December 13, 2013, 3D Systems Corporation announced its acquisition of Village Plastics. The Bolson account was among the receivables. Village continued to operate as a wholly-owned subsidiary.

On or around January 7, 2014, the original 2008 Agreement terminated by its original terms due to Bolson's failure to place an order for 90 successive days. Throughout January, Village attempted to get back in touch with Bolson. Village informed Bolson that, although Bolson would now need to prepay for orders, the 3D Systems acquisition would not prevent the parties from doing business. Bolson did not reply. Nor did Bolson pay the outstanding balance within the 60 days specified by the Release.

In June 2014, Bolson sued Village and its new parent company, 3D Systems, alleging a laundry list of claims, including breach of the Non-Compete Agreement before and after execution of the Release. Village and 3D Systems jointly filed a counterclaim for Bolson's outstanding balance plus interest and costs.

In September 2016, the district court entered summary judgment in Defendants' favor on all but the breach of contract claims and the counterclaim. *Bolson Materials Int'l, Inc. v. 3d Sys. Corp.*, No. 5:14CV01441, 2016 WL 5661613, at *7 (N.D. Ohio Sept. 30, 2016). A year later, the district court granted Defendants' motion for summary judgment on these remaining claims and the counterclaim. *Bolson Materials, Int'l, Inc. v. 3D Sys. Corp.*, No. 5:14CV01441, 2017 WL 4169644, at *4 (N.D. Ohio Sept. 20, 2017). Bolson appeals.

## II.

 "We review the district court's grant of summary judgment de novo." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 433 (6th Cir. 2009). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At this stage, we "view the facts and draw reasonable inferences in the light most favorable" to the nonmovant—here, Bolson. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal citations and quotation marks omitted).

## III.

Bolson first appeals the district court's grant of summary judgment on Bolson's breach of contract claims. At issue is whether Village's filament sales to certain resellers breached the terms of the Agreement. *See Kirkland v. St. Elizabeth Hosp. Med. Ctr.*, 34 F. App'x 174, 178 (6th Cir.

2002) (citations omitted) (a breach of contract claim requires proof of the existence of a contract, performance by plaintiff, breach by defendant, and damages).

The non-disclosure provision of the Agreement restricts Village's rights to use or share Bolson's confidential information, including material specifications and other trade secrets, relating to the production of "[f]ilaments for use in Fused Deposition Method (FDM) type prototyping machines." The non-compete provision of the Agreement then states:

> FOR GOOD CONSIDERATION, the Undersigned [Village Plastics] jointly and severally covenant and agree not to compete with the business of BMI [Bolson] and its lawful successors and assigns. The term "not compete" as used herein shall mean that the VP [Village] shall only sell filaments that can be used in FDM type prototyping machines where:
> 1. The VP Customer is not an existing BMI customer AND
> 2. The VP customer is using the product "in-house" AND
> 3. The VP customer is not reselling the filament.

Bolson claims that, both before and after the parties signed the Release, Village breached the non-compete provision by selling filaments to resellers. In the summary judgment proceedings below, Bolson presented evidence of Village's high volume sales to filament resellers. However, the district court declined to infer that these resellers necessarily resold the filaments rather than merely using the products in-house. *Bolson*, 2017 WL 4169644, at *4. Thus, the district court entered summary judgment against Bolson on the breach of contract claims.

We reverse. The district court failed to acknowledge that Bolson also submitted screenshots of reseller websites listing Village filaments for resale in December 2011 and April 2014 while the non-compete period remained in effect. Affording Bolson all reasonable inferences, these exhibits establish a genuine dispute of material fact as to whether certain Village customers resold Village products before and after the parties signed the Release.[2]

Having rejected the district court's holding, we next turn to the parties' central dispute over the scope of the non-compete provision. The parties disagree as to what kind of filament sales are

---

[2] On appeal, Village contends that we should reject these exhibits as unauthenticated and inadmissible hearsay. However, Village waived these arguments by failing to object in the district court that Bolson's facts "cannot be presented in a form that would be admissible in evidence." *See* FED. R. CIV. P. 56(c)(2); *see also El-Seblani v. IndyMac Mortg. Servs.*, 510 F. App'x 425, 427 n.1 (6th Cir. 2013); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). Had Village objected, Bolson could have been afforded the opportunity to address the objections and proffer proper evidence. *See* FED. R. CIV. P. 56(e)(1). We cannot deprive Bolson of that opportunity now.

governed by the Agreement. From 2008 to 2014, the business of Bolson consisted of selling reprogrammed chips and filaments for use in Stratasys 3D printers. The Stratasys 3D printing process is known by the trademarked term "fused deposition modeling" ("FDM"). To avoid trademark infringement, the 3D printing community coined alternative terminology—such as "fused filament fabrication" ("FFF") and "plastic jet printing" ("PJP")—to describe various 3D printing processes.

The Agreement states its purpose as governing Village's sale of filaments for use in "Fused Deposition Method" ("FDM") printers. Bolson claims that, although "fused deposition *modeling*" is a trademarked term for the Stratasys process, the Agreement used "Fused Deposition *Method*" as a generic term denoting both the Stratasys 3D printing process and its imitators. Bolson's interpretation would forbid Village from selling any 3D printing filaments to any customer who then resells the filaments.

Village, however, asserts that we should read "Fused Deposition *Method*" and "FDM" as synonymous with the Stratasys-trademarked terms "fused deposition *modeling*" and "FDM." Village contends that the Agreement only governed the sale of the Stratasys-compatible filaments based on Bolson's confidential information. Under this interpretation, the Agreement allowed Village to sell any other filaments to any other customer for any purpose.

Under Ohio law, contractual interpretation starts as "a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citations omitted). "When the language in a contract is clear and unambiguous, a court may look no further than the writing itself to ascertain the intent of the parties." *LublinSussman Grp. LLP v. Lee*, No. L–17–1077, 2018 WL 1040227, at *3 (Ohio Ct. App. Feb. 23, 2018) (citation omitted). Ambiguity arises when the meaning of contractual language "cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Id*.

The plain language of the Agreement supplies no definition for the phrase "Fused Deposition Method (FDM) type prototyping machines." "Fused Deposition Method" is a technical term which has a special meaning in the 3D printing community. When the "special meaning" of a technical term within "a particular trade or industry" is "not reflected on the face of the

agreement," Ohio courts permit the use of extrinsic evidence to define the term. *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 151 (Ohio 1978) (citations omitted).

Taken as a whole, the evidence in the record—comprised of various reports, articles, and webpage screenshots—demonstrates that the term "Fused Deposition Method" has been used within 3D printing circles to refer to both the patented Stratasys process and its imitators.[3]

Viewing the facts in the light most favorable to Bolson, the record supports "two or more reasonable interpretations" of the term. *LublinSussman*, 2018 WL 1040227, at *3. Neither the contemporaneous Blanket Purchase Order nor the limited evidence in the record concerning the parties' negotiations resolves this ambiguity. As such, the ambiguity "presents a question of fact for the fact-finder." *See Davis v. Loopco Indus., Inc.*, 609 N.E.2d 144, 145 (Ohio 1993); *see also Career & Tech. Assn. v. Auburn Vocational Sch. Dist. Bd. of Edn.*, No. 2013–L–010, 2014 WL 1478838, at *6 (Ohio Ct. App. Apr. 14, 2014) (reversing summary judgment because a genuine issue of material fact existed regarding the meaning of an ambiguous technical term); *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (citing *Manley v. Plasti-Line, Inc.*, 808 F.2d 468, 471 (6th Cir. 1987)) ("Summary judgment is then proper only when the documents in question are undisputed and reveal that no question exists as to intent.").

Because Bolson's evidence creates a genuine issue of material fact as to whether the Agreement governed the sale of any filaments or only those filaments based upon Bolson's trade secrets, we reverse the district court's grant of summary judgment as to Bolson's breach claims.

## IV.

Bolson next seeks to resurrect its contamination and delay claims against Village. The parties signed a Release settling both claims. "[A] release is an absolute bar to a later asserted claim encompassed in the scope of the release." *Waste Mgmt., Inc. v. Danis Indus. Corp.*, No. C-3-00-256, 2004 WL 5345389, at *8 (S.D. Ohio Feb. 24, 2004). However, a release procured by fraud is voidable. *Bank of Am., N.A. v. Corporex Realty & Inv. Corp.*, 661 F. App'x 305, 313 (6th

---

[3] Furthermore, Bolson has presented evidence that any filaments—including those not based upon Bolson's "recipe"—could function in Stratasys machines provided that the user had the reprogrammed chip. Thus, even accepting Village's argument that "FDM type" means "Stratasys," there is nonetheless a genuine dispute of material fact as to whether all of Village's filaments were "filaments that *can be used* in [Stratasys] prototyping machines" per the language of the Agreement.

Cir. 2016). Bolson alleges that Village fraudulently induced Bolson to sign the Release. To establish a right to relief on this fraudulent inducement claim, Bolson must show:

> (1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance.

*Lepera v. Fuson,* 613 N.E.2d 1060, 1063 (Ohio Ct. App. 1992).

The district court found that Bolson could not show the element of injury because "Bolson's own failure to [place an order within 90 days] triggered the end of the Non–Compete and the business relationship." *Bolson*, 2016 WL 5661613, at *5. The district court thus granted summary judgment in favor of Village and 3D Systems on Bolson's fraudulent inducement, contamination, and delay claims and 3D Systems' counterclaim.

We affirm. Drawing all reasonable inferences in Bolson's favor, Bolson's evidence fails to satisfy the elements of fraudulent inducement.

Bolson advances two distinct theories of fraudulent inducement. First, Bolson alleges that Village tricked Bolson into settling for a nominal sum while secretly plotting to make the continuation of the parties' business relationship contingent upon Bolson acceding to new cumbersome conditions Village would impose as soon as Bolson signed the Release. The record does not support this. *See Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)) (appellate courts should reject a nonmovant's narrative when "it is 'so utterly discredited by the record' as to be rendered a 'visible fiction'"). During the Release negotiations, Village expressly indicated that Bolson's held shipments would be shipped once Bolson signed the Release, but Village would not fulfill any new purchase orders until Bolson also signed the revised non-compete terms.[4] Village also informed Heenan before signing that Village expected him to complete credit application paperwork. Fully

---

[4] Although evidence relating to settlement offers is generally inadmissible, such evidence is permitted when offered for the purpose of showing that a party fraudulently induced a settlement. *See* FED. R. EVID. 408 advisory committee's note to 2006 amendment.

aware that Village intended to impose these new conditions, Heenan signed nonetheless. No false promise of future business occurred.

Second, Bolson argues that Village misrepresented its culpability for the filament contamination by concealing warnings made by a former Village plant manager, Terry Hart. In February 2016, Hart signed a typed declaration stating that he had warned Village that using the same dryers for different products risked cross-contamination. Bolson filed a handwritten note signed by Hart to the same effect. Two weeks later, Hart withdrew the declaration, claiming that the declaration was inaccurate, that he had never approved it, and that Heenan had "pressured" him into signing the handwritten note.

Assuming we take Hart's withdrawn declaration as true, Bolson has still failed to show that Village made false representations or concealed a material fact that Village had a duty to disclose. During negotiations, Village set aside the question of fault and agreed to the credit to avoid the costly and time-consuming litigation before us today. Bolson has offered no argument as to why Village had a duty to disclose Hart's warnings. Given that Village capitulated to Bolson's demand for compensation, Bolson has not shown any "intent to induce reliance" on the part of Village. *Lepera*, 613 N.E.2d at 1063. Nor has Bolson shown "justifiable reliance under the circumstances," because Bolson began the negotiations brandishing a "conclusive" laboratory report purporting to identify Village as the source of the contamination. *Id.* Having failed to show false representation, concealment, or justifiable reliance, Bolson cannot show that its reliance on Village's representations "proximately caused" any financial injuries Bolson may have suffered. *Id.* Accordingly, we affirm the district court's grant of summary judgment on Bolson's fraudulent inducement claim.

Bolson also seeks to setoff the monetary damages from its contamination and delay claims against the 3D Systems counterclaim. However, because we find the Release to be enforceable, Bolson's contamination and delay claims remain barred, and Bolson cannot setoff these claims against 3D Systems' counterclaim.

Finally, Bolson argues that the district court erred by denying Bolson additional discovery. In the district court, Bolson filed a sur-reply requesting additional discovery regarding the withdrawal of Hart's declaration. The district court concluded—as do we—that Bolson's

fraudulent inducement claim would fail even if Hart's withdrawn declaration were accepted as true. *Bolson*, 2016 WL 5661613, at *7. Thus, the district court did not err in denying Bolson's request. This court cannot grant additional discovery as to any other issues because Bolson did not provide the district court with affidavits or declarations showing the need for additional discovery as to any other issues. FED. R. CIV. P. 56(d).

## V.

For the reasons above, we **REVERSE** the district court's grant of summary judgment as to Bolson's breach of contract claims. We **AFFIRM** the district court's decision as to Bolson's remaining claims. We **REMAND** the case to the district court for further proceedings consistent with this opinion.